**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

LAWANNA HARRIS                                                                                            PLAINTIFF

v.                                              No. 4:11CV00679 JLH

SOUTHWEST POWER POOL, INC.;
STACY DUCKETT; MALINDA SEE;
TOM DUNN; and BRIAN SMITH                                                                        DEFENDANTS

**OPINION AND ORDER**

Lawanna Harris brings this action against her former employer, Southwest Power Pool, Inc., and the individual defendants for alleged violations of the Arkansas Civil Rights Act of 1993, 42 U.S.C. § 1981, and the Fair Labor Standards Act. Harris has filed a motion for a protective order or to compel asking the Court to permit her to discuss information with her counsel that Southwest claims is protected by the attorney-client privilege. Harris also asks the Court to stay her obligation to answer or supplement Southwest's discovery requests until the Court rules on her motion. Harris has recently filed a separate motion asking the Court to stay the scheduling order in this action because she does not believe that she can adequately prepare for deposition or trial unless she is able to talk freely with her counsel. For the following reasons, the Court will deny Harris's motions.

**I.**

Harris was employed in Southwest's human resources department as a human resources generalist. Document #27, p. 10. In her complaint, she alleges that she was a nonexempt employee who was treated as exempt and, consequently, unlawfully denied overtime pay whenever she worked in excess of forty hours per week. Document #10. Harris has testified that her job duties consisted in doing background checks, interviews, composing job discretions, posting open positions, onboarding processes, and recruiting. Document #27, p. 10. She testified that she dealt with outside

counsel from time to time, including seeking their advice on legal issues that arose. *Id.* at 10-11. In 2006, Harris worked with outside counsel on an audit involving exempt and nonexempt employees. She testified that her role was to give an account of each employee's duties, job descriptions, education, experience, and status as exempt or nonexempt. She participated in phone calls with outside counsel and performed tasks requested by outside counsel in relation to the audit. *Id.* at 11. She discussed the information on a monthly basis with her manager. *Id.* at 11-12. She also conferred with and performed work for Southwest's general counsel. *Id.* at 13, 16. Harris testified that she considered herself a representative of Southwest. *Id.* at 13. She testified that she was aware of some of the results of the audit—specifically, the parts she worked on. *Id.* at 17. She testified that she was told she should keep the results of the audit confidential. *Id.* at 17-18. She testified that she was not aware that any on the results of the audit were communicated beyond employees of Southwest. *Id.* at 18.

In July of 2011, Southwest contacted the Department of Labor regarding possible employee classification violations of the FLSA. *Id.* at 6. Southwest issued a notice entitled "FAQs: Fair Labor Standards Act Compliance." Document #17-1. In that document, Southwest states: "In July of this year, SPP identified a need to initiate a review to ensure that SPP complies with the FLSA, in particular how SPP jobs are classified—either Exempt or Non-Exempt." *Id.* at 3. Southwest began the process of settling with employees who were erroneously classified under the supervision of the DOL. Southwest states that it has settled with over 160 present and former employees. These employees have signed a DOL form which waives the right to seek further damages, such as liquidated damages. *See* Document #27, p. 34.

## II.

The parties agree that the 2006 audit was an attorney/client communication, but disagree as to whether the audit falls within the crime-fraud exception to the privilege.[1] Because federal law supplies the rule of decision in this action, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs." Fed. R. Evid. 501. Proposed Fed. R. of Evid. 503(d) expresses the well-established rule that the attorney-client privilege does not apply "[i]f the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." *See In re Bieter Co.*, 16 F.3d 929, 935 (8th Cir. 1994) ("Although not enacted by Congress, courts have relied upon [proposed rule 503] as an accurate definition of the federal common law of attorney-client privilege."); *see also In re BankAmerica Corp. Sec. Litig.*, 270 F.3d 639, 641-42 (8th Cir. 2001) ("[I]t is well established that the attorney-client privilege 'does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.' ") (quoting *United States v. Zolin*, 491 U.S. 554, 563, 109 S. Ct. 2619, 2627, 105 L. Ed. 2d 469 (1989)). As the Eighth Circuit has stated,

> In *Zolin*, the Supreme Court clarified the procedure that district courts should adopt in deciding motions to compel production of allegedly privileged documents under the crime-fraud exception. First, the Court resolved a conflict in the circuits by holding that the district court has discretion to conduct an *in camera* review of the

---

[1] Based on Harris's testimony, the privilege does apply. *See In re Bieter Co.*, 16 F.3d at 935 ("[T]he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication is within the scope of the employee's corporate duties; and (5) the communication is not disseminated beyond those persons who, because of the corporate structure, need to know its contents.") (quoting *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 609 (8th Cir. 1977) (en banc)).

>allegedly privileged documents. Second, concerned that routine *in camera* review would encourage opponents of the privilege to engage in groundless fishing expeditions, the Court ruled that the discretion to review *in camera* may not be exercised unless the party urging disclosure has made a threshold showing "of a factual basis adequate to support a good faith belief by a reasonable person" that the crime-fraud exception applies. Third, if the party seeking discovery has made that threshold showing, the discretionary decision whether to conduct *in camera* review should be made "in light of the facts and circumstances of the particular case," including the volume of materials in question, their relative importance to the case, and the likelihood that the crime-fraud exception will be found to apply.

*In re BankAmerica Corp. Sec. Litig.*, 270 F.3d at 641-42 (citations omitted). "A moving party does not satisfy this threshold burden merely by alleging that a fraud occurred and asserting that disclosure of any privileged communications may help prove the fraud." *Id.* at 642. "There must be a specific showing that a particular document or communication was made in furtherance of the client's alleged crime or fraud." *Id.*

Here, Harris argues that the audit may provide evidence that Southwest was aware in 2006 that some of its employees had been mis-classified, even though the company did not take steps to rectify these mis-classifications until 2011. Harris argues that this potential evidence could establish that Southwest's post-2006 mis-classifications were willful—triggering the three-year statue of limitations period and possibly punitive damages.[2]  *See* 29 U.S.C. § 255(a). Consequently, according to Harris, Southwest's statement to its employees—that it did not discover that it had mis-classified some of them until 2011—constitutes a fraudulent attempt to limit its liability[3] by

---

[2] There is a split among the circuits regarding whether a plaintiff may recover punitive damages pursuant to the FLSA. *See Wolfe v. Clear Title, LLC*, 654 F. Supp. 2d 929, 934-35 (E.D. Ark. 2009) (collecting cases). The undersigned judge has held that punitive damages might be appropriate in some FLSA actions, such as where the employer willfully violates the Act. *Id.* at 937.

[3] Southwest points out that the employees who settled were informed that they were waiving their rights to seek liquidated damages and that they did not have to settle but could, instead, file a private lawsuit or join a collective action against Southwest.

intentionally misrepresenting to them that Southwest was not aware of any mis-classifications prior to 2011 and, therefore, would not be liable for willful mis-classification.[4]

Southwest contends that Harris misstates its notice by claiming that it says that Southwest did not learn of any mis-classifications until 2011. Southwest points out that the statement only says that Southwest "identified a need to initiate a review to ensure that SPP complies with the FLSA, in particular how SPP jobs are classified—either Exempt or Non-Exempt." Harris's allegation of intentional misrepresentation depends upon interpreting "identified a need to initiate a review" as "first discovered that certain employees had been mis-classified."[5] In light of the actual language used by Southwest, it is doubtful that the company's statement, which serves as the basis of Harris's fraud allegation, establishes a good-faith belief that Southwest actually engaged in fraud.[6] *See*,

---

[4] The Court has denied with prejudice Harris's motion for certification of an FLSA class composed of nonexempt employees of Southwest who were treated as exempt. *See Harris v. Sw. Power Pool, Inc.*, No. 4:11CV679, 2011 WL 5402763 (E.D. Ark. Nov. 8, 2011). Nevertheless, even if Harris herself has not relied upon Southwest's statement, her allegations regarding Southwest's attempt to mislead other employees is relevant to the instant motion because she is attempting to establish the crime-fraud exception to the attorney-client privilege. That exception does not depend upon whether Harris herself was a target or victim of the fraud.

[5] Or, at least, that a reasonable person would have interpreted Southwest's statement to imply or otherwise indicate that the company had only just discovered the mis-classifications. *See* Restatement (Second) of Torts § 527 (1977) ("A representation that the maker knows to be capable of two interpretations, one of which he knows to be false and the other true is fraudulent if it is made: (a) with the intention that it be understood in the sense in which it is false, or (b) without any belief or expectation as to how it will be understood, or (c) with reckless indifference as to how it will be understood."); § 529 ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."); § 526 ("A misrepresentation is fraudulent if the maker . . . (b) does not have the confidence in the accuracy of his representation that he states *or implies*[.]") (emphasis added).

[6] If there is no good-faith reason to believe that Southwest engaged in fraud, then *a fortiori* there is no good-faith reason to believe that the crime-fraud exception would apply.

*Baum v. Helget Gas Prods., Inc.*, 440 F.3d 1019, 1024 (8th Cir. 2006) (ambiguous document did not amount to a false statement for the purposes of establishing fraudulent misrepresentation).

In this case, the Court need not decide whether Southwest's statement was a fraudulent misrepresentation because Harris has failed to offer any evidence that Southwest asked its law firm to perform the audit *for the purpose of furthering* a continuing or contemplated criminal or fraudulent scheme. "[I]t is not enough to show that an attorney's advice was sought before" the allegedly fraudulent action. *In re BankAmerica Corp. Sec. Litig.*, 270 F.3d at 643-44 ("Companies operating in today's complex legal and regulatory environments routinely seek legal advice about how to handle all sorts of matters . . . . There is nothing necessarily suspicious about the officers of this corporation getting such advice . . . . Showing temporal proximity between the communication and a crime is not enough.") (quoting *In re Sealed Case*, 107 F.3d 46, 50 (D.C. Cir. 1997)). Accepting, *arguendo*, Harris's account of the events, Southwest obtained an audit in 2006 and subsequently engaged in fraudulent activity. Beyond this, Harris only offers conclusory allegations that the audit was obtained for the purpose of furthering the 2011 misrepresentation. Assuming, *arguendo*, that Southwest's single statement was an intentional misrepresentation, Harris has failed to offer evidence giving rise to a good faith belief that Southwest asked its law firm to perform the audit in order to enable the company to commit fraud.

If the information in Harris's possession regarding the audit were to establish that, in 2006, Southwest was aware that Harris had been mis-classified yet took no corrective action, the information would certainly be relevant to establish that Southwest willfully violated the FLSA by continuing to treat Harris as nonexempt. Nevertheless, "[t]hat the [audit] may help *prove* that a

fraud occurred does not mean that it was *used* in perpetrating the fraud." *Pritchard-Keang Nam Corp. v. Jaworski*, 751 F.2d 277, 283 (8th Cir. 1984) (emphasis in original).

Harris may not disclose any confidential information regarding the audit. Therefore, the Court must deny Harris's motion for a protective order or to compel.

Harris also asks the Court to stay her obligation to answer or supplement Southwest's discovery requests until ruling on her motion. That request is denied as moot.

Harris has filed another motion asking the Court to stay the scheduling order in this action because she does not believe that she can adequately prepare for deposition or trial unless she is able to talk freely with her counsel. Because the Court concludes that the crime-fraud exception does not permit Harris to disclose any confidential information pertaining to the audit, Harris's motion to stay the scheduling order is denied.

## CONCLUSION

For the reasons stated above, Harris's motion for a protective order or to compel is DENIED. Document #34. Harris's motion to stay the scheduling order is likewise DENIED. Document #41.

IT IS SO ORDERED this 28th day of February, 2012.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE